at Illinois Department of Human Services and its Secretary, Appellee Janie Cozziano. Thank you. Counsel, you may approach. Melissa B. is a woman who has been diagnosed with mental retardation, now known as intellectual and one a psychologist, the neuropsychologist being Dr. DeWolf, the psychologist being Dr. Velez. She's in a nursing home and would like to leave this nursing home and live a more regularized life in the community. She's seeking home and community-based services under the Illinois Waiver for Adults with DD, because she'd like to live in her own home, in a group home, a SILA. In order to qualify for SILA, the Illinois rules set forth by the Division of Developmental Disabilities, which is a department of DHS, a person has to go through what is known as a PASS process, pre-admission screening process. The PASS process begins with a PASS agent gathering information, and that information essentially is clinical information to establish whether a person has a developmental disability or not a developmental disability. In this instance, as part of the PASS process, the person, in order to be clinically eligible for mental retardation, has to demonstrate a reasonable basis that the person's mental retardation arose during their developmental years, 18 or before. This is known as the age of onset and is a primary issue in this case. The state has promulgated a PASS manual. That PASS manual is actually tendered to the federal government as part of the waiver application process and constitutes the policy and procedures manual, and the court in Beecher held that as interpretive guidelines for these types of cases. And it is the guidance which the entire process is guided by, both by the PASS agents and by the states. The PASS manual has a section in it, 500.20G, I'll refer to that as paragraph G, which has a good two pages of guidance on how to make age of onset determinations. In this case, the ALJ, nor the PASS agent, looked to paragraph G for its guidance. Instead, the record contained in the ALJ's decision references only paragraph A, which is just the general rule, the concept that you have to establish your age of onset as being age 18. So in essence, the proper rule that would have guided this determination was not used, and that led to an erroneous determination by the administrative law judge to find that Melissa B did not satisfy her age of onset. Basically, what was in the record regarding psychological... One thing I want to point out about paragraph G is it sets forth the evidentiary standard of reasonable basis to make these determinations, but it also provides three different tiers of reliability of information that guides this process. And it's in the first tier, primary professional sources. Those are essentially doctors, psychologists, and neuropsychologists. And in that provision, it provides that the test results that arose prior to age 18 are given the most weight. They're not dispositive in that rule. Nothing says they're dispositive. So even tests within age 18, you test their reliability. You don't just look at their date. So the department provided, or the record, I should say, establishes three psychological reports. We have a 1993 report, which is all of four pages. We have a neuropsychologist report, which comes later, which is 13 pages. And then Dr. Valdes, who testified and was the sole testifying expert at the hearing, had an 11-page report. So in 1993, she was 25 years old? She was 25 years old, so that test is outside the age 18. And the administrative law judge in this case essentially adopted Mr. Braywood's testimony. He would be a Tier 2 professional. Braywood and Hunke would fall under that second tier of reliability for making the determination of age of onset. And he put her at 75, which was above. Actually, 75 isn't really above the cutoff. If you take a look at the DSM-IV provisions which are provided in the materials, the DSM-IV doesn't have a hard cutoff number. It says approximately age 75. It's significant. One of the things that isn't made clear in the record, unless you look at the tests administered by Dr. X, I shouldn't say Dr. X, but we don't know. That's the thing about this clinical psychologist. We don't know if he's a doctor or not in 1993. We know he's a clinical psychologist at Zeller. But in 1998, and I can provide the citation to the court, the state passed the Clinical Psychologist Licensing Act. And that was when, in 1998, clinical psychologists had to have PhDs to perform these tests. So a couple of things about that 1993 test that need to be observed, or need to be recognized, I should say. First of all, there is no, when you take a look through that, there is no adaptive functioning test that's performed in that. And when you look at the DSM-IV, as well as Dr. Velez's testimony on that, adaptive functioning has to be tested to make any access to diagnosis, whether the person has borderline or mental retardation. That's not performed. And that, in and of itself, lends one to question why this test was given and what was the purpose for it. And was this a full clinical picture that was presented? The other thing about the 1993 test is that it demonstrates that the performance and the verbal are consistent. And it's a Waze-R test that was performed. The two tests that come afterwards are the Waze-III tests. They update these tests and they improve these tests. And I submit that the Waze-III provides a more accurate clinical picture, and it's certainly a more thorough testing picture that we see for those tests that come later. And when you're trying to weigh different tests against each other at that period of time, they're all after the age of onset. So you have to take a look at the substance of the tests. And that wasn't done by the administrative law judge in this case. The administrative law judge simply applied a date closest to age of onset must be the most reliable, and that was the sole basis for the ALJ's decision. In fact, she completely rejects Dr. Velez's testimony. And Dr. Velez testified that, lookit, this test is an outlier. We've got question marks. There's an MMPI that was provided to Melissa. And that was inappropriate given her reading level. You know, the credentials aren't specified. Let's assume for the sake of argument that we should disregard the 1993 test performed by Zeller. Then the ALJ judge had the 2004 report and the 2009 report both varying five IQ points, but both putting her in the MR range. Right. But that was at age 35 and 39. So whose burden of proof is it to show that the onset occurred at age 18? In my mind, I'm thinking age 22. Twenty-two is for developmental disability, which would be like your cerebral palsy or epilepsy or autism. Eighteen is for mental retardation. Okay, and so is 18 the year we need to worry about in this case? Eighteen is the year that we need to be looking at here for this, because the basis for the eligibility determination we allege is mental retardation. There's affirmative evidence in the record to establish her age of onset. Okay, which would be 1986, then, based on her birth date. Is it her burden of proof to show mental retardation prior to that date, 1986? It's upon the applicant to demonstrate their eligibility, certainly, and that would be a component of it.  Okay, what you have in the record is you have a, and it's undisputed, that she was in special education. And Dr. Velez testified the only thing that she could have been in special education for would have been her mental retardation. And the reason why is when you provide this testing, you take a look and determine whether her academic testing is congruent to her functional testing. And in this instance, the DeWolf report and the Velez report demonstrate that, in fact, they are congruent. There's not a large difference between the two. Under the DSM-IV and under Dr. Velez's testimony, in order to have a learning disability, such as dyslexia or central auditory processing disorder, the things that respond in it is suggestive as being in the record as being, ha-ha, she's a learning disabled. That whole basis for that testimony comes from Terry Braidwood's interpretation of the psychologist report. He's a tier two professional interpreting the psychologist report, and he makes a mistake. He says, well, it says she's there for learning disability. Under the DSM-IV and in general psychological parlance for educators, mental retardation is a learning disability, but they're using it in the global sense. They're not using it in the specific sense under the DSM-IV, which the provisions are in the record that specifically talk about a specific learning disability. And I will cite that provision of the record. I have it. I'll provide that report. Oh, it's discussed, I believe, yes, it's the DSM-IV, which is Appendix 34, C187 in the record. Thank you. And so you have affirmative evidence in the form of the fact that she's in special education, the fact that her testing demonstrates that she's not learning disabled, and the fact that you have the testimony supported by the two social security cases that we offer, that IQs are stable over time. The tables change that you use for the particular person as they age and for the different age groups, but they're stable over time. But the IQs you're relying on were not stable. They varied by five points and they were going down. My understanding was 69 and 67. That's a two-point difference. I was thinking it was 69 and 65, but I'll look at the record, too. And even if it was 69 and 65, remember there's a five-point margin of error difference in these. And that means that it's not statistically significant. And that's at age 35. I believe so, yes. And so under Chase and Farney, you've got an expert testifying. Lookit, she would have been. I'm really sorry, but if it was 69 or 67 in 2004, and five years later it was two points lower, it's going down, then if we extrapolate backwards, why wouldn't that suggest she was higher when she was younger and it was declining with age? Well, because two test points are not statistically significant, and when you're taking and looking at the two Waze R's, you have to compare the Waze 3s, you have to compare those against each other, not against that Waze R that was the earlier test in 93. I'm disregarding 93 for purposes of my question. It's not dispositive of a trend line, if that's the concern. Again, just within the plus and minus error of these reports. And it's not uncommon to see that at all. And you have the expert, you have Dr. Velez's testimony. That's the thing that cements this determination of her age of onset. She testified that she was mentally retarded, had to have been mentally retarded at age 18 for the affirmative reasons that I cited and for the reasons why the 93 report should be discredited. And so if you take a look at the Farney case and the Chase case, it's clear that the state didn't offer an expert witness. I know that in the reply brief, counsel suggests that, well, gosh, there's competent competing expert evidence in the record, but that's not competent competing expert evidence in the record because the Chase and Farney case, which relied upon the McCormick on evidence, makes it clear that you have to have an expert there in order to use your agency expertise present to be cross-examined. And that wasn't done here. And so the administrative law judge simply disregards Dr. Velez's testimony, the only expert testimony in this, simply saying, well, she didn't provide any records to support her conclusions. When, in fact, the 93, her own test data are those records and her own expert opinion testimony as well. Her expert testimony is not a record, but certainly that's why you call expert opinion witnesses to provide their opinions based upon their education and their experiences. She certainly has a considerable amount of education and experience. The record does not suggest any intervening events, getting back to your concern about the decline. There's no narrative in any of the reports. There's nothing in the record that suggests there was any kind of intervening trauma, any kind of deterioration in her condition. There's nothing in the record at all that would suggest, other than the fact that you've got those two scores that are within the margin of error, the plus five deviation standard. And so there's nothing to suggest that any type of confounding factor is present in her clinical presentation that would demonstrate a level of decline, ongoing level of decline. If I understand this, I mean, basically the state's position seems to be that, well, we don't really question whether there's mental retardation. It's whether you proved that the onset was before age 18. Correct. That is correct. And that rule paragraph G specifically provides in it that tests after the age of onset can be used to establish the age of onset. It's very difficult for an individual to, I mean, in the record, Terry Bravewood even testified, I tried to find my own school records and I couldn't locate them. And so the schools routinely destroy these records. And for somebody in their 40s, 50s, I mean, the state has a policy of trying to support individuals in the home when they can be supported. That's the HVSS program, which is a component of the waiver. They look to families to support these individuals. And sometimes these family members die. Sometimes they become so old they themselves have to go into a nursing home. And so it's really an unfair burden on the plaintiff or the claimant to have to establish with documentary evidence within the period of 18 that existed within the period of 18 that, in fact, they had mental retardation. Some of these folks that are getting up in their years, it even predates the education of the Handicap Act. And so you're not going to have those records available. And the state's own policy acknowledges this by saying tests outside of the age of onset can be reliable and can be evidence that would establish the age of onset. And in this case, it was conflicting evidence. In this case, it's conflicting evidence only. It's conflicting evidence if you weigh the evidence, but the ALJ didn't weigh any of the evidence. The ALJ just said, well, this is the earliest test, and that's just positive. When you've got an overwhelming majority of evidence that demonstrates that that test is unreliable, shouldn't have been used, and just simply based upon the date only, be rejected. Are you suggesting that we can just strike that evidence as a matter of law? I'm suggesting that if you take a look at the decision, you will see that the decision specifically says this test is supposed to be given the most weight of all of these tests because of the time frame in it. The rule that should have been applied doesn't say that at all, and I'm saying that that test, based upon Dr. Velez's testimony, is inherently unreliable. I'm not asking that it be stricken, but it shouldn't have been given any weight by the administrative law judge or by this court. There's not a legal basis to strike it? I'm not suggesting there's a legal basis to strike it. I'm just saying it's not good evidence at all. And the basis for that is based on the expert's testimony? The expert's testimony and the test itself. It doesn't express subtests, which are very important to determine if a thorough test was provided. The fact that an MMPI, which is supposed to be given to somebody who's at the 6th grade reading level, was given to somebody at the 4th grade reading level, that draws some question marks as to, you know, is this examiner qualified? What's he looking for in this? Is this a full battery of tests? She's in a state-operated hospital. Were they looking to run this in a... Does all that go to weight? It goes to weight, but certainly the weight of that test should have been completely disregarded by the ALJ, but instead she gave it full credence solely based on date. That's the only weighing that went on in this record is what are the dates, and it's very clear from the ALJ's very brief report. I know the record that she submits looks long, but that's just simply a regurgitation of the evidence that took place at the hearing. There was no analysis of any of Dr. Velez's credibility. The only reason why it was rejected was simply based upon, well, gosh, she didn't provide us any records to support her opinion. Well, that's why it's an opinion expert. You know, you have records of Dr. Ekstrom's report, her own test data, the test data of Dr. Wolf. So it's based upon tests, upon evidence, but her expert opinion really is controlling in this matter because she says this test is an outlier, it's unreliable. And the fact, and it's silent, that it was given a functional assessment, and the DSM-IV makes it absolutely clear that in order to be a valid test report, to be a valid diagnosis on Axis II, you have to have a functional assessment, and that wasn't done here, and that inherently makes that test completely unreliable, and that's clearly spelled out in the DSM-IV. Can you speak to the standard of review? Because I believe you indicate it's clearly erroneous. Well, the issue of whether that rule, G, should have applied, that's Danilovo. Review of the documentary evidence is Danilovo. It's a mixed question of fact and clearly erroneous on the others, and Biekert makes that pretty clear. It's because you've got this rule, and the question is, had this rule been properly applied? And essentially it's a rule of evidence, so it's supposed to go through and use this rule to test all the documents that are provided as well as a testimony to it. And when you're providing that rule to the evidence, that becomes a mixed question of law and fact, and that was recognized in these very SILA eligibility determination matters by the Biekert Court. Okay. Valise concluded that her IQ was 65. Am I correct? I think so, Your Honor. The O4 report is 67. That's Dr. DeWolfe's. And Dr. Valise's test was 65. And so if there's a five-point variation, 65 could be 70. Well, that takes you into the margin of error, and that's the reason why the functional testing is so important. And the DSM-IV makes it clear that the functional testing ñ I mean, you can have people with a 65 IQ who are so high-functioning they wouldn't qualify. There's a case in the Biekert matter that was recognized, Partlow was the name of that case, that recognized that that was in fact the situation because he functioned real highly. He learned adaptive skills that could help him live in the community independently. Whereas a person with a 75, even upwards to an 80 IQ, would have very low functional capability, which Melissa exhibits could support a diagnosis of mental retardation. That's why the number on the test is so misleading, and it shouldn't be the sole thing that's looked at. All right. You've answered my question. Thank you. Thank you for your time. Ms. Fabiano? May I please report? I'm Janet Fabiano. I'm an assistant attorney general here on behalf of the Defendant Appellees. The department found that the plaintiff was ineligible for services under the Medicaid waiver program for persons with developmental disabilities because it found she didn't demonstrate that she had a developmental disability. In particular, it found she didn't demonstrate that she manifested mental retardation during the developmental period. This finding was well- Let me ask you about that. I mean, in essence, the state's defense below was she didn't show that this mental retardation was onset before age 80. Correct. I mean, I struggle with this because, to me, the concept of mental retardation onset above the age of 18 seems like an oxymoron. In other words, I mean, I've been referred to as a 60-year-old that acts like an 18-year-old, but not in the terms of mental retardation. Mental retardation, it seems to me, when your mental growth slows or stunts during the developmental phase up to 18. Usually by age 18, while people get psychoses and other mental illnesses after that, those wouldn't be referred to as mental retardation. It's the retardation of the growth during a child's aging and growing that is commonly referred to, as I understand it, mental retardation as opposed to some other mental illness. Well, the DSM does define mental retardation as having a significantly sub-average intellectual functioning that exists concurrently with impairment in adaptive behavior, and that originates before the age of 18. So the question here is whether or not they have demonstrated that that happened in this case. Well, if somebody has a subpar IQ, whenever they test them, isn't it reasonable, and the only reasonable inference, that this occurred before age 18, the onset was before age 18? Well, in this case, we do have evidence that a psychological evaluation that was performed for her close to her developmental period, which was when she was 25 years old, and under this evaluation, they did not find that she had mental retardation. But that report, which, by the way, is uncross-examined, is written by somebody that is apparently a clinical psychologist, but I don't know today whether that person was a Ph.D., for example. Did you ever know a Ph.D. who didn't write Ph.D. after their name when they signed something? And there's no indication on it that this is that way. You do have psychologists that come in and testify in this case who do the full battery of tests and come up with an opposite conclusion. They also conclude that the test that was done by the state's guy was incomplete. There should have been more testing done to evaluate all this kind of stuff. So it was criticized, and there was nobody to say, well, every test that should have been done was done with respect to this. Was it a 95 test? 93. 93 test. And as far as the records of her care before she was 18, they've been destroyed. Not by her, but by the state or the schools. Even the 2004 and 2009 evaluations, which were performed 18 to 22 years after the relevant time period, aren't sufficient to demonstrate that she manifested mental retardation during the developmental years, meaning before the age of 18. They did not address in any significant way her cognitive abilities or her adaptive behaviors during the relevant time period. They both note that she had an extensive history of mental illness, and they never addressed what role that played, how that affected the results. For example, they noted that she had a history of hallucinations and delusion and depression. They had diagnosed her with schizoaffective disorder. One diagnosed her with borderline personality disorder. And in fact, the 2004 evaluation noted that she was actively delusional during the evaluation. And yet they never addressed what effect this had on her abilities at that time. In addition, these evaluations, when they do address what sort of limitations that she had, they attribute the limitations to her mental health issues and her physical issues and not to any cognitive issues. For example, they mention that she has a severely impaired ability to manage her activities of daily living and say that this is due to her psychiatric and her medical condition, that she's currently not a candidate for gainful employment due to her psychiatric and her medical condition, that her recall of her life history and memory is affected by her psychiatric condition. So these evaluations... Was mental retardation a psychiatric condition? No. I mean, they address that differently in these evaluations when they're rendering diagnoses. So again, these evaluations were not sufficient to demonstrate that during the relevant time period. I mean, this is a program for persons with developmental disabilities. And to have a developmental disability due to mental retardation, it has to onset before the age of 18. And these evaluations do not show that. They don't address at all her cognitive abilities or her adaptive behaviors during that period of time. And then in addition, the evaluation that was prepared closest to that period of time, when she was 25 years old, it concluded that she did not have mental retardation at that time. So again, the issue here... They are really just asking the court to re-weigh the evidence. And this all goes to the weight of the evidence. And it's the role of the agency to weigh the evidence and determine its credibility, and that's not the function of the court on administrative review. And the agency here has, based upon the evidence here, their decision is supported by the evidence. You have three psychological evaluations, two of which were prepared 18 to 22 years after the fact and never addressed her abilities during the period that's relevant here. And the one that was prepared closest to that period concluded that she was not. And the one that was prepared in that period, what were this guy's qualifications? I don't know. What test did he do? I don't know. You didn't know all the tests. Exactly what did he do? I don't know. And he's not around anymore. What Dr. Velez had testified was that he didn't list the sub-test scores. That was her criticism of it. But it actually mentions the sub-test scores in the test. It refers to them, and it notes that there was no significant... It didn't show any areas of strengths or weaknesses. But they did conduct the test, and it does refer to the test in that report. And, again, he's a clinical psychologist. The report does state that he is a clinical psychologist. Was that report prepared by the, I call it the Zeller zone or Zeller, because at age 19 she was suicidal, she was hallucinating, she was hearing voices, and that evaluation in 93 was for involuntary commitment, wasn't it? Well, it was an evaluation where they did send her to Zellner for these concerns. And then he conducted it. So what happens if somebody with psychiatric problems, such as suicidal ideation and hallucinations, ends up in a group home with mentally retarded people that have had their condition since age 18? Well, yeah, I mean... Is that the purpose of this rule, that you truly have to be developmentally disabled and not psychotic? That is correct. I mean, this is a program for developmentally disabled persons, so they have to be developmentally disabled. And the evidence has to show that they are developmentally disabled, meaning that it originated during their developmental years. And the evidence here just doesn't show that, and the department's decision is certainly not against the manifest way of the evidence. It's certainly supported by the evidence. Well, if somebody is developmentally disabled, but because of other conditions, psychoses, that make them a danger to the other people, then they can still be excluded, right? I mean, if you don't have... Just because somebody was developmentally disabled, if there isn't another legitimate basis to exclude them from a group home, i.e. they pose a danger to the other members of the group or themselves or others in that setting, then that would be a legitimate basis not to put them in a group home, wouldn't it? They may be able to take that into consideration at some other point. I mean, the issue here was simply whether or not she's developmentally disabled. And the evidence supports the department's decision here that they haven't demonstrated that she manifested mental retardation prior to the age of 18. You know, opposing counsel has stressed the gradation of the different reports and how some should be given more consideration than others. But also, it's still the rule that deference on questions of fact, deference is given to the department. Yes, that's absolutely correct. I mean, when you're dealing with questions of fact, it is the department's responsibility to weigh the evidence and assess the credibility of the evidence. It's not the function of the court on administrative review. Now, your position is that standard review for us in this case is manifest weight. Yes. Do you disagree with your opponent that it's a mixed question? Yeah, as far as the issue of whether or not she manifested mental retardation prior to the age of 18, that would be a question of fact. And again, I just want to mention, I mean, they're saying that they did not follow their rules under the PSA manual. And there is no, they were acting consistent with the manual here. I mean, the manual just simply said that assessments by psychologists are the first tier deserving of weight, and then there are subsequent tiers. So the evaluations here were both conducted by psychologists. So there's, you know, so they just simply, there's no weight, claiming that the rules were not followed. And you also agree the relevant age is 18 and not 22? Yes. For mental retardation, the relevant age is age 18. So for these reasons, we would ask that the department's decision be affirmed. Thank you. Counsel? I know, I've noticed today maybe we should nudge those tables apart a bit. I wanted to touch on the issue of EDMI. Under the waiver, psychiatric services are available as an enumerated service in the Illinois HCBS waiver. In fact, individuals in SILAs very often have mental illnesses and are well-managed in those SILAs, but they're not considered as an enumerated service. And they're being treated by a psychiatrist in those SILAs. And in the testimony of Kerry Bravewood, it's in the record at C-592, was asked about folks with mental illness living in SILAs, and his answer was yes. And then the question is, but I'm asking, isn't it true that there are individuals with both developmental disabilities as a mild mental retardation and mental illnesses who have been successfully integrated into the community in a SILA or group home? Answer, sure. And so the state's own person testifying, their Tier 2 expert, acknowledges that their system is full of individuals with DD and MI. And if it turns out she can't be, then she doesn't go. Exactly. In fact, there is a discharge process, and the Rule 120 that's specified in the record, 120.110, actually specifies an appeals process. And during that appeals process, the provider can, and they have, And so there's a mechanism that people are not improperly placed in the system. I did want to cite that statute that I mentioned, the Licensed Psychologist Clinical Act. It's 225-ILCS-15-10, and the effective date was 7-29-98. One of the things is, the question is, does the mental illness impact her test results? The reason why there's no discussion in the record, lengthy discussion in the record of the impact of her mental illness on her test results is because it didn't impact them. A psychologist will indicate when they're getting unreliable test data and will put that specifically in their report. The fact that it's not mentioned in the report means it doesn't exist because it's always addressed if it's a problem. In fact, Dr. Velez testified that she was with Melissa for four hours and saw absolutely no indication that her mental illness was in any way impacting the reliability of the test data or her opinion that her cognitive and functional deficits arise from her developmental disability. The issue of subtests, depending upon the purpose for the test, a full battery of subtests is not always given if they're looking for a particular domain or a particular issue. So it's absolutely significant that those subtests be specified and every psychological report I've ever reviewed expresses those subtests. You have to know what was tested, what the instruments are they do use. It's not like you just open a book and say, okay, I'm going to use this test and I'm going to use this test and I'm going to use this test. There is some discretion within the field of psychology as to what would be the appropriate test. Some psychologists test functionality using the adaptive behavior scales. Other psychologists prefer using the Vineland test. Others will look at the ICAP scoring. In this case, Melissa was given both a Vineland and an ICAP. They were consistent and they showed she had functional deficits and these functional deficits are related to her developmental disability which drive the determination that notwithstanding a 75 IQ, she's consistently functioning in the mental retardation range. Thank you. Thank you very much. We'll be taking the matter under advisement and issuing a decision without undue delay for now. We'll take a brief recess for a panel change.